Good morning, Your Honors, and thank you. Mark Vanderhout, appearing on behalf of Petitioner along with my co-counsel, Kelsey Morales. Ms. Lin and her husband, Mr. Deglow, couldn't make it from San Diego due to health reasons, but I believe they're watching on the streaming now and their son, Kyle, is here in court today. I plan on reserving three minutes for rebuttal. I'll try to help you, but keep your eye on the clock, okay? Yes, sir. There are five separate agency decisions involved in this case, and three separate BIA holdings up for review. The BIA's affirmance of the I.J.'s finding of removability, its reversal of the I.J.'s grant of the waiver, and its affirmance of the denial of asylum. We believe all of these decisions are erroneous and require reversal. The most clear of these errors is the Board's reversal of the I.J.'s grant of the waiver, in which the Board completely failed to discuss any of the significant equities and hardships that the immigration judge delineated in his 20-page analysis and grant. I will advance — What's our jurisdiction to review the denial of the waiver? Is it — do you agree that if the Board denied it as a discretionary matter, we can't review that exercise of discretion? That's — that would be true if it completely did the proper analysis, but the court's holding — Well, no, I — that's my question. Let's assume that it just simply said in the exercise of our discretion we choose not to grant this waiver. And — Does it — is it required also to do a proper analysis of why it refuses to exercise its discretion? It does, Your Honor. The court cases are clear in Rashtabidi, in Arizal. Those cases hold that the Board must discuss the relevant factors, balance the positive inequities, show that it's done that consideration, and explain why. Just tell me why the Board didn't meet that standard here when it said we — more briefly than the I.J., to be sure, but it did discuss why it was exercising its discretion not to grant. It discussed — it discussed the negative factors, but it didn't discuss at all any of the significant hardship to the husband or the children. And that is a factor that's laid out in — in matter of Tijam. And this Court's decision in — in Zheng actually controls this. It was very analogous. In Zheng, which was a discretionary 212C decision, the Board had failed to consider at all the community ties and the importance to the community of Mr. Zheng, even though he had a very significant negative record, had been in prison for decades. With respect, I don't understand you to have answered my colleague's question. 212C involves the discretion of the Attorney General and his designates. We don't have jurisdiction to review those cases, do we? Yes, you do, Your Honor. And this is what I'm trying to explain, and maybe not well, that the — this Court in Zheng, which was a discretionary — review of a discretionary denial in — in — of 212C, said, we have jurisdiction to review whether the Board has properly done its analysis. We can't substitute. But we have to review whether they considered all of the factors and properly considered them that were laid out by the Board. And here in matter of Tijam, one of the seven factors that is listed as — that must be considered by the agency is a significant hardship, if there is, to petitioner and their family. Well, but see, here's where I'm having difficulty with that. The Board says, while the Respondent's equitable considerations are significant, so it did give credit to the — to the equitable side to — to your client and her family, but nonetheless found that they were outweighed by many negative factors. So I take it your argument must be that it's not enough to lump them together. The Board must separate out each of these factors and — and delineate how much weight it gives to each of them? Mr. Beebe says that. Our result says that. But does it — does it really say you must — you must independently treat each factor as opposed to saying, we're assuming all these equitable factors are in her favor, but we have such negative factors here that we're not going to grant — Yes, Your Honor. The Court's opinions do say that. And Zheng is the — like I said, is the most obvious one. Because in Zheng, the Board had considered certain factors, but had left out one of the specific factors set forth in — Well, but I guess I'm asking — let me — and just try this one more time, and then I'll stop on it. Is it not okay for the Board to say, on all the positive factors, we agree that they're significant in her favor? We've — we're giving her credit for all those. We don't need to go down them one by one. She wins on all of them. But we think the negative ones that we are talking about are so great that the positive factors are outweighed. They don't mention at all. That would not be sufficient. They don't mention — I say — I agree they don't mention them at all. That's not my question. Can — is that consistent with the case law? Can you say, there's positive factors, they're terrific, all of them are in her favor, but the negative ones are so bad, we're not — No, you cannot. And I — it's set forth in our briefing, and I'd like to refer the Court to specifically say that. And I want to give the analogy of why this is just like Zheng. In Zheng, like I said, they didn't consider the community ties and involvement. But counsel, if we do what you're saying, we end up reviewing the discretionary decision of the Attorney General's designates and giving ourselves jurisdiction to review whether they did it correctly. Isn't that the very thing that bars us from jurisdiction in 100212C? No, Your Honor, because the Board has to show it considered the relevant factors. I mean, we have set this in our briefing. If you look at Zheng, I'm convinced — I don't read it the same way you do. This is like a 3553A in a criminal setting. The Court has to consider it in that setting. The BIA has to consider it. But I know of nothing that says they've got to go down and tick off every single one and analyze them individually, right? They have to — there was no consideration at all of the hardship to the husband, the hardship to the children. That was not considered at all. You don't know that, as my colleague has indicated. They indicated there were some positive equities. Counsel, with respect, you should listen to the Court before you start talking. With all due respect, they did say there were many positive things to say. They didn't tick them all off individually, but they did consider them. You're saying they have to lay out every single one. And my question is, if you do that, and you're asking, then we review whether they did it accurately. What this Court has held is they have to look at the precedent decisions, which is matter of Tijam in this case. Matter of Tijam lists seven factors for them to consider. One of them, in particular, is a significant hardship to petitioner and family. That has to be discussed. It was not discussed. None of the issues regarding the testimony of the husband, of any of the children, of the psychologists, of the psychiatrists, talking about suicidal ideations, about the separation of the family, the inability of the kids to go home, all of that is significant hardship that wasn't mentioned at all. Yes, all the Court's decisions, Zheng, Ratashibi, Arizal, all confirm that they have to be explained and have to be stated. If the Board had done, you know, maybe six or seven discussions and eliminated one insignificant one, that would be different. Here, there was not a single iota. In six lines, six lines on 872, the Board says something about equities, but never discusses the hardship. You may want to move on to different topics, but let me ask you one last question on this one. You agree, I take it you don't think the IJ's decision on this point is deficient? Because he ruled in your favor. He spent 20 pages discussing the testimony and discussing the pros and cons. This is a hypothetical, so you don't have to tell me it's not this case. Could the Board have said we agree with the IJ's weighing of all the positive factors, but not with his weighing of the negative factors? They might have been able to if they adopt the IJ's decision, but they didn't do that here. They do a de novo review. And here they do a de novo review, and in a de novo review, they have to show they considered all the factors. And the main factor here that wasn't considered, and I repeat, is that nothing about the hardship to the spouse or the children. I should move on to the movability. Here, the Board and the IJ erred in finding that the DHS met its burden by clear convincing unequivocal evidence, as the finding was based on inadmissible hearsay and was unreliable. First, and perhaps... Why, counsel, why is that? They looked at, and I'm just going to kick these off here, looked like they had copies under seal from the clerk of the Taipei court. The tax statements came from the National Tax Administration of Taipei. Why aren't those documents reliable? They're certified public documents from an authorized court or administration. Why are they hearsay? Well, what was hearsay and unreliable were the... what was relied on by the immigration judge and the Board, which was the withholding statements and the tax records. Those were only, quote-unquote, authenticated by this agent, Sacramento, who spoke to somebody at the consulate and said... I understand what these things say and that's what he said. Didn't they have a stamp on them that they were from the... No. ...from the agency? Only the court stuff had a stamp on it. Only the court did, correct. Correct. Did you dispute the authenticity of these documents? Absolutely. How? What did you... We said they were inadmissible under... No, I said you said they were inadmissible. That's not my point. We disputed their authenticity under HCFR 287.6. We said they weren't properly authenticated. Okay. Well, that's not my question. My question is, did you dispute the accuracy of these documents? We did, yes. So in other words, your client said, that's not true. I actually paid withholding on my earnings from Win-Win? Absolutely. And... Yes. ...but late. I couldn't... But late. I didn't see that in the record. Did she present evidence that she actually paid taxes on earnings from Win-Win? Yes, she did. And she submitted that in 2000, that she paid taxes on those, and those were accepted by the Taiwanese government and the amendments, and they accepted the late penalties. But to answer your question about the... Right. Late. Later. I'm sorry. Later. Yes. I'm sorry. That's not my... I asked the wrong question. To answer... At the time, in 1994 and 1995, she didn't submit any evidence that she paid taxes on the earnings from Win-Win, right? In 1996, when things were submitted, she submitted these withholding statements, and those were what were alleged to be fraudulent, and those are the ones that didn't dispute. Right. But she did not contend before the I.J. that, in fact, taxes had been withheld during those years on Win-Win. No. But the issue was whether in 1996, after she paid the taxes in January 1996, after she received the income, were those 1994 and 1995 returns fraudulent or not, and those were not properly authenticated. Let me just also address, if I say... You want to save time? It's up to you, but you're down to 234. I will just make two other comments. We also believe that it was erroneous, notwithstanding authentication, that the court relied, immigration judge relied, on the fact of the conviction and the facts established in the proceeding in Taiwan, to find Respondent culpable. Twelve different times in within five pages of the discussion, the immigration judge referred to the findings of the Taiwanese court, yet that was a different party, her brother. Nothing to do with her. Different interests, different motives, and you can't use the findings of another court to find someone culpable in this court. Lastly, just briefly on asylum, since I don't have time, I just want to say that the wrong standard was used there. In asylum adjudication, the board again erred. It used the would-be standard instead of the 10 percent probability standard, and it's got to be reversed on that basis alone, and I'll reserve my minute and a half now for closing. I trust the government is not going to read that. I hope not, Your Honor. May it please the court. Jonathan Robbins here on behalf of William Barr, the Attorney General. Good morning to each of you. There are several issues in this case. I'll focus on the three primary issues subject, of course, to the court's questioning. The first is why the record doesn't compel reversal of the immigration judge and board's finding that DHS met its burden of demonstrating that Petitioner acquired her status in the United States through fraud or willful misrepresentation. The second issue relates to the court's lack of jurisdiction, as Your Honor has discussed, with respect to the discretionary denial of Petitioner's request for a waiver of that fraud. And the third issue, if we have time to get to it, deals with Petitioner's applications for asylum withholding or removal. On the first issue, on removability, help me understand the framework that applies when the allegedly fraudulent statement is not made by the Petitioner herself, but rather made by a company, I guess, sort of on her behalf. So what does the government have to prove in that context? Because the ground for removability, it seems like, is predicated on the Petitioner herself having made some kind of a fraudulent statement, right? Yes. But that's not technically what happened here? Or help me understand how that works. Well, it seems like Your Honor is taking issue with the fact that the fraud, the intent to defraud here, was basically determined by sort of circumstantial evidence. But actually, Judge Smith authored the opinion in Manta v. Chertoff in which this So how do we infer her intent to defraud from when Wyn Wyn's fraudulent misrepresentation? That's the – that's – I mean, we all agree it can be done from circumstantial evidence. What circumstantial evidence shows that Wyn Wyn was lying on her behalf? Well, there's a number of things. At her behest, I suppose, is the better way to put it. Okay. Well, the first – the way the fraud was revealed in this case was through the court proceedings that happened in Taiwan. So the first thing that DHS did was to submit all the court documents that it had out of Taiwan, because that's where it was revealed that Petitioner didn't actually have a job prior to coming to work to – for CY International in Florida. And so those documents demonstrated that her brother and – brother-in-law and husband had to fabricate these documents in order to demonstrate that she had supposedly worked as a – in a managing capacity for Wyn Wyn at that time. Now, when Petitioner was offered an opportunity to rebut that evidence, the first thing she did was she pled the Fifth Amendment. Now, that's not hearsay evidence. I'll admit that the court documents are hearsay evidence, putting aside the fact that hearsay is admissible in immigration court. But the very – the first thing that she did is refuse to testify in an opportunity to rebut those documents. That, the immigration judge noted, is he is permitted to make an adverse inference in that regard. And certainly, you know, the standard here is the record has to compel a contrary conclusion. To be blunt, I don't think any factfinder who saw that evidence where you have court documents showing one thing and then a refusal to testify about the details of potential criminal activity, I don't know a factfinder that wouldn't raise an eyebrow at that particular – at the veracity of the claim in that regard. Now, there – it's worth pointing out that the court documents in this case were specifically substantiated because Petitioner, at the end of the day, does not dispute that the – that her husband and brother-in-law were subject to trial in Taiwan. And DHS, of course, substantiated that with other documents, like the criminal So in terms of what a reasonable factfinder can infer from this evidence, I think it's perfectly reasonable for an immigration judge to infer fraud on Petitioner's behalf. And the inference you're drawing is that she knew that the documents that the company submitted to get her – I can't remember, it's a visa that she was – or what was she obtaining? She obtained – it was essentially an E-18 classification. Oh, she adjusted her status on an I-140 petition, which is an employment petition. Yeah, yeah, right. But it's – that was done on the basis of documents that this company submitted. She didn't submit anything, right, on – not herself personally. And so the inference you say is reasonable here is that she must have known what the company was doing on her behalf and that the documents it submitted to the government were fraudulent? Well, it's not just those documents as well. Petitioner also did eventually decide to give up her opportunity to plead the fifth and actually did ultimately testify as to some of the things when she was questioned about her work and what capacity she was working at Win-Win. And she was – had real problems on the stand. She wasn't able to name clients for CUI International. She wasn't able to remember the names and titles of people that she had worked for. Well, but that may demonstrate that the information supported on behalf of the I-140 was fraudulent. But how does that demonstrate that she was complicit in that fraudulent activity? Well, that's something that I think that is made by inference. I agree that – I mean, that's ultimately a decision of whether you can persuade a fact finder. Because the nature of an I-140 petition is always going to be that the petition is filed on behalf of someone else. Sure. Right? If you couldn't infer fraud to the beneficiary of the petition, you would never be able to show fraud. You would never be able to revoke that because of fraud. In fact, the immigration judge discussed this a little bit. No, I get that. I'm not questioning that part of it. But if – tell me if I'm remembering the facts right. The two documents, the critical documents that were submitted to the government by the company were these withholding statements for $94.95. Yes. Right? Reflecting the salary she earned at Win-Win. Yes. So she, when she eventually does address this, she says, no, I did work in a managerial capacity during those years. What's – and I'm not contesting, I guess, that those documents are fraudulent because I didn't actually get the money until 96 or sometime later. But she's saying, I did work there. Now, I didn't know anything about these documents that the company submitted on my behalf. Maybe those turned out to be fraudulent. I don't know. But how have you proved that somehow – I mean, do you think you've proved that she, in fact, did not work in a managerial capacity? Or – and in addition, that she somehow knew that these documents that were submitted to the U.S. government were fraudulent? Well, I think when you combine that with the fact that the excuse that she gave for these – she did testify as to what these documents were and why they didn't show salary. And her claim was that her accountant forgot to file taxes, which, of course, brings into relevance the DHS's submission of the tax statements that showed that she did actually report taxes during those years. So when you combine her lack of credibility about testifying about the inference that she actually did know what was filed – now, I mean, I take – at the end of the day, it's a question for a fact-finder to determine. Is there enough evidence to demonstrate that the burden of proof was met? I would say that under the circumstances, the record doesn't compel a conclusion that the – that a reasonable fact-finder would have to say that the burden of proof wasn't met here. I agree that it's possible that maybe a more lenient fact-finder could say maybe this is not enough. But if the evidence could go either way, the Court should defer to the decision of the immigration judge. And this is a pretty well-reasoned decision by the immigration judge. He did go through really in great detail his problems with the petitioner's credibility. And petitioners are somehow suggesting that the credibility is not evidence that can be used against her. That, to me, just runs afoul of just sort of commonly accepted results of what happens when you take the stand. When you take the stand, your credibility is always an issue. And it's commonly recognized that if you're not credible, your lack of credibility can be used against you in meeting the other side's burden of proof. It's one of the primary reasons that, for example, in criminal proceedings, lawyers don't put their clients on the stand. So, yes, a lack of credibility in your testimony when you're testifying about a major type of fraud like this, I think that can be used to meet your burden – the government's burden of proof. And as a practical matter, when we're dealing with these cases in immigration proceedings, it's the way it works is it does – the immigration judge doesn't say, okay, DHS, you have the first burden to meet. So now you present your evidence. And then petitioner, now's your chance to rebutt. You present your evidence. The evidence kind of spills out all at once, depending on the order of the testimony. And the IJ sorts through afterwards and says, well, I think this meets your burden of – this meets the government's burden of proof. And this meets the petitioner's rebuttal. But the immigration judge is allowed to use the petitioner's testimony to help meet the government's burden of proof. Can I ask you about the – not the court documents, but I guess, where are they, the tax documents that Agent Sacramento purported to authenticate? Yes. Tell me why you think that he was able to do that, because my sense was that he really was not – he had no personal knowledge of where these documents even came from. The immigration said exactly that. In fact, if you look at page 3492 of the record, the immigration judge said, I'm not crediting Agent Sacramento's details of these untranslated documents. But the documents after the fact were – did end up getting translated. And the immigration judge said, look, I'm not going to credit what Agent Sacramento said about them. But I am going to – I'm talking about the accuracy of the translation. I'm talking about the source of the documents. If he doesn't have personal knowledge as to where they even came from – and that's my understanding of the record. They – he just says, well, they were already in the file when I took over the case. I have no idea who got these, where they came from, right? If those documents were the only documents in the record, maybe there might be an issue with the sufficiency of the evidence and whether it was reliable. But this is, remember, also in conjunction with a whole bunch of other documents which were certified in accordance with regulation, the Taiwanese court documents. And I think it's perfectly reasonable for the immigration judge to say, look, there's all these other documents that are certified. There are these other documents. I don't think they're fraudulent, right? I don't think the government is trying to defraud the court with – by bringing these documents in. If they'd been relied on by themselves, maybe there'd be a problem. But in conjunction with all the other certified documents – and those documents, by the way, they don't purport to show what DHS needed to meet its burden with, right? DHS needed to show that the documents that were submitted with the I-140 were fraudulent. Those documents, they don't speak directly to that question. They do address Petitioner's argument that her accountant forgot to file taxes, and they expose that for what it is. But that is sort of a secondary issue to the primary issue, which the government did support the fabrication of those documents with certified evidence. So I would say that – You said the fabrication of those documents? Yeah, the fabrication of the withholding – of the withholding documents that Petitioner submitted in support of her I-140 application. The two documents from 1994 and 1995. Can you turn, unless you want to say more on that topic, to the waiver issue? Sure. There is language in GENG which keeps using the word all. The court – the BIA abuses its discretion when it fails to consider all favorable and unfavorable factors. I take it your friend is not arguing about the unfavorable factors. So how do we know that the board considered all favorable factors? Well, first of all, the board said that it did, and that's number one. And I would point this court to the binding precedent in Laredo-Martinez against INS, in which this court expressly held that the board is presumed to have said otherwise. Now I will concede that there have been cases in the past where the court has expressed concern of situations where the board has missed something of extreme importance. So for example, what we've seen quite often in immigration proceedings is the alien will attach – will file a motion to reopen and attach just basically a document dump, just hundreds of pages of state reports, letters, reports, things of that nature, and sometimes buried in those reports is something very important, and the court has expressed concern that the board overlooked the evidence. But here, that's not really relevant here. In order for the board to have looked to the positive factors, it would have had to have – remember, this is a three-member panel of the board that made this decision. All three members of the board would have had to, A, not read the IJ's decision that they were overturning. B, would have had to have not considered all the arguments that had been advanced on appeal, and the board specifically explained that it had considered the arguments advanced on appeal, and would have also had to ignore the fact that there was all this testimony from all these witnesses. But A, B, and C are true without regard to whether they said they did. Those are true in every case we review. There's always three members. There's always an IJ decision. Well, there's not always three members. And there's always documents. So, I mean, we start out with – you know, you start out with the notion that they should have done that, but our cases seem to say they need to show us their homework. Respectfully, Your Honor, I disagree. Lurita Martinez is binding precedent. The cases that the – there are cases that say that the board does have to consider all the evidence, but it doesn't say that it has to expressly mention all the evidence. And that's the distinction here. Lurita Martinez stands for the proposition that the board is presumed to have considered the evidence even if it expressly declines to mention it. That precedent is binding, and Petitioner doesn't really address that in his brief or in the argument before this Court. Now, as it happens, I think Your Honor has discussed this at length with my colleague, but the board did consider the positive factors in this case. Admittedly, it wasn't as detailed as the immigration judge's decision, but the board is not required to be as detailed. A long decision is not required when a short one will do. And the board explained – and the board did consider hardship. The board considered the value to – of Petitioner to her community and the problems that would – the hardship that would happen to her family. When we're talking about hardship, and we're – I mean, a lot of these issues are interrelated. When you're talking about the children and the separation, those all go to the issue of hardship because removal is always a hardship when somebody is in a situation like this. But this isn't a situation where the board overlooked the evidence. I mean, I'm sure Your Honors have seen cases where the board could be accused of being too cursory or going too fast. This is not one of those cases. The agency – this case had the agency's full attention. There was no overlooking of evidence in this case. I think you can feel confident that the board considered the issues here. Sotomayor, I have one technical question. When – when she was removable under board's opinion because she fraudulently obtained status, what status did she fraudulently obtain? A lawful permanent resident status. She successfully adjusted her status under the I-140 visa petition because it classified her as a – Right. And that was my question. The I-140 didn't give her LPR status, did it, granting of that petition? Didn't she have to do something more to get LPR status? I mean, she – no. I believe she got a green card based off of that I-140. So you get it based simply under granting of the I-140 petition. That's my understanding, and she did. Okay. That's what I couldn't tell from this record. Sometimes you need to do more. And we know that she did have a green card because during the testimony it ended up not being an issue in – before this Court, but at one point DHS was arguing that she hadn't entered with inspection, and it was an issue because she would – they were talking about whether she would have presented her green card at the border. That's what – that's what had me confused. Okay. Okay. Other questions by my colleague? Okay. Thank you very much. Thank you very much for your time, Your Honors. Appreciate it. Appreciate it. The Petitioner has a little more time. So just briefly, because that's all I have, I think you're on ahead on the major issue here, which we discussed in our – in our opening brief, which was the fraud was not by Petitioner. There is a two-step process, and my colleague is not correct that the I-140 is the end process. The I-140 contained the fraud, but Petitioner had zero to do with that. She didn't sign it. She didn't review it. Well, that's your – that's your contention, I understand. Correct. But the second process is the adjustment of status process. And there was no allegation and nothing in the immigration judge's decision to say that there was fraud in that by the Petitioner. Okay. So that – that leads to the question I was going to ask your colleague. Correct. Is it sufficient, then, for purposes of the finding of unremovability, if in fact she committed fraud in the I-140 process? If she had? I know.  I've already said I understand your contention. You don't have to tell me she didn't. Would it be sufficient if she had committed fraud in the I-140 process to find her removable? If she had somehow incorporated that into the adjustment. She'd lie. Don't. Yes. I've asked you to assume that she committed fraud. So don't – don't tell me she didn't. If she did. Okay. Assume that she committed fraud in the I-140 process. It would be sufficient. That would be sufficient. So we don't have to worry about the rest of the process for obtaining LPR status. But what should have happened is, and there would have been a procedure for the Immigration Service to do, and I just want to briefly explain. What they should have done is revoke the I-140 for it having been obtained by fraud, and then she couldn't have obtained a permanent residency. But they didn't do that. And there would have been a procedure for them to have done that, and that would have been the argument. But they failed to do that. They tried to impute the fraud, alleged fraud, of the Petitioner, the company, to her, and that can't be done. Okay. Very well.  Thank you very much.  You're past your time. Any other questions by my colleagues? All right. Thanks to both counsel for their argument. The case just argued is submitted.
judges: M. Smith, Watford, Hurwitz